Filed 12/28/23  Yang v. Shanying Internat. Holdings Corp. CA2/8

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION EIGHT

| | |
|---|---|
| JEFFREY QIUHONG YANG, | B317227 |
| Plaintiff and Appellant, | Los Angeles County Super. Ct. No. 20STCV45192 |
| v. | |
| SHANYING INTERNATIONAL HOLDINGS CORPORATION LTD., | |
| Defendant and Respondent. | |

APPEAL from an order of the Superior Court of Los Angeles County, Curtis A. Kin, Judge.  Affirmed.

Workplace Justice Advocates, Tamara S. Freeze and Sharon Perez for Plaintiff and Appellant.

DLA Piper, Melanie E. Walker and Akhil Sheth for Defendant and Respondent.

_____

# INTRODUCTION

Appellant Jeffrey Qiuhong Yang (Yang) filed a complaint alleging breach of contract, wrongful termination, and whistleblower retaliation against his former employer, Global Win Capital Corporation (Global Win). Yang also named Global Win's China-based twice-removed parent corporation, Shanying International Holdings Corporation Limited (Shanying), as a defendant in the lawsuit.

Shanying specially appeared and moved to quash service of the summons and the complaint based on lack of personal jurisdiction. The trial court granted the motion. We exercise an independent review of the record and find no general or specific jurisdiction over Shanying. We affirm.

# FACTUAL AND PROCEDURAL BACKGROUND

## A. *Relevant Factual Background*

Global Win, formed on October 2, 2017, is a Delaware corporation and a subsidiary of Shanying. Global Win holds ownership interests in entities that own or operate pulp, paper, packaging, and wastepaper recycling businesses in the United States.

Shanying is a Chinese corporation formed on October 20, 1999 that trades on the Shanghai Stock Exchange. Shanying is the parent company of Global Win.

## B. *Yang's Civil Complaint*

On November 24, 2020, Yang filed a civil complaint against Global Win, Shanying, and Kevin Yulin Jiang (Jiang) for whistleblower retaliation, breach of contract, breach of the covenant of good faith and fair dealing, violation of Business and

2

Professions Code section 17200 et seq., wrongful termination, and defamation.

The complaint alleged Yang entered into the Executive Employment Agreement (employment agreement) with Global Win for the position of Chief Financial Officer (CFO) on September 10, 2017.  Yang performed his work at 1520 Bridgegate Drive, Suite 206, in Diamond Bar, California.  Yang alleged that both Global Win's and Shanying's principal business offices are located at that address.

In his capacity as CFO, Yang "reported multiple serious fraudulent activities" by Global Win, its headquarters, and affiliated company management to "manipulate the parent company financial profit . . . and [Global Win's] receipt of approximate $80 million financing from China without following proper government regulation . . . of international money transfer from China to the United States."  Yang refused to participate in such "illegal activities and raised his concerns to the upper management."  This ultimately led to termination of Yang's employment.

On October 22, 2019, Yang received "a surprise Termination Notice . . . stating that he would be terminated on October 25, 2019 for alleged 'serious misconduct.' "  The termination notice "falsely accused" Yang of committing multiple incidents of fraud, theft, embezzlement, breach of fiduciary duties, and material breach of obligations under the employment agreement.

Yang included a copy of the employment agreement as an exhibit to the complaint.  The employment agreement provides it is "made and entered . . . by and between [Global Win], a Delaware corporation and a subsidiary of [Shanying]."  It

3

specifies that Global Win "hereby employs [Yang] as its Chief Financial Officer." The last page of the employment agreement includes two signatures. Underneath "Jeffrey Qiuhong Yang" is Yang's signature, and underneath "Global Win Capital Corporation" is Jiang's signature. Jiang's position is specified as "VP Human Resources"; the line beneath Jiang's position states "Shanying International Holdings Corporation Limited."

## C. *Shanying's Motion to Quash Service of Summons and Complaint*

On January 27, 2021, Shanying filed a motion to quash the summons and complaint for lack of personal jurisdiction under Code of Civil Procedure section 418.10, subdivision (a). Shanying argued the California court lacked both general and specific jurisdiction over it.

At the hearing on March 23, 2021, the trial court denied the motion without prejudice to give Yang more "time to do jurisdictional discovery." The trial court invited specially appearing Shanying to file a new motion to quash thereafter.

Months of discovery followed, including production of over 2,000 documents totaling over 16,000 pages.

## D. *First Amended Complaint*

On July 27, 2021, Yang filed his first amended complaint (FAC) with the same causes of action and factual allegations as in the original complaint. We recite new or different allegations:

Yang now alleged he entered into the employment agreement with Global Win *and Shanying*. The employment agreement was signed by Yang and Jiang—as the "VP Human Resources *of Shanying*." In his capacity as CFO, Yang "discovered and reported multiple serious fraudulent activities"

4

by Global Win *and Shanying*, its headquarters, and affiliated company management in order to "manipulate the parent company financial profit . . . and [Global Win's] receipt of approximate $80 million financing from China without following proper government regulation."

E.     ***Shanying's Second Motion to Quash Service of Summons and Complaint***

On September 24, 2021, Shanying renewed his motion to quash the summons and service of the FAC.  Shanying again argued the California court lacked both general and specific jurisdiction over Shanying.

Shanying identified itself as the "indirect foreign parent corporation" of Global Win.  Shanying argued it is a passive holding company organized under the laws of and headquartered in China.  Shanying "does not conduct any business and, instead, passively holds investments in its subsidiaries."  It has never been licensed to conduct business in California or anywhere in the United States in general; it has not had meaningful contacts with California.  Shanying neither employed Yang nor has an employment relationship with him.

In support of its motion, Shanying submitted the declarations of Jintang Pan (Pan) and Jiang.

Pan's declaration provides:

Pan is the "Director and Vice President of [Shanying]." Shanying was formed in China in 1999; its principal place of business, offices, and mailing address are in China.  Shanying has never been incorporated in, licensed to conduct business in, or had its principal place of business in California.  Shanying trades on the Shanghai Stock Exchange but not on any stock exchange in the United States.  Shanying "operates . . . as a

5

passive holding company—i.e., it held the ownership interest in other entities, but it did not operate any business." Global Win, formed in Delaware in 2017, is a "passive holding company that holds ownership interest in entities that own or operate pulp, paper, packaging, and wastepaper recycling businesses in the United States." Shanying and Global Win are "separate corporate entities." Shanying was the "*indirect* parent company of Global Win." Shanying has not controlled or supervised the day-to-day operations of Global Win, including its management, its business functions, and decisions related to the hiring or termination of Global Win's employees. Shanying never employed Yang nor had any employment relationship with him. Shanying is not in possession, custody, or control of the employment agreement or any other records relating to Yang's employment with Global Win.

Pan attached as exhibits to his declaration a Certificate of Incorporation of Global Win filed in Delaware; a Certificate of No Record Corporation for Shanying issued by the California Secretary of State; and Global Win's Statement and Designation by Foreign Corporation, also issued by the California Secretary of State.

Jiang's declaration provides:

Jiang is the Vice President at Shanying and previously served as Vice President of Human Resources. Jiang is also the Director and President of Global Win since late October 2019 and previously served as its Vice President from November 2018 to August 2020 and Chief Executive Officer from August 2020 to January 2021.

6

Jiang attached as exhibits to his declaration a copy of Global Win's termination notice to Yang, dated October 22, 2019, and an organization chart for Phoenix Paper Wickliffe LLC (Phoenix Paper). The organization chart shows the structure of the parent and subsidiary companies. Shanying owns 100 percent of Zhejiang Shanying Paper (Zhejiang) and 100 percent of Cycle Link International Holdings (Cycle Link Int'l). Zhejiang owns 100 percent of two subsidiaries—Global Win Company, Ltd. (GW Company) and Cycle Link USA. GW Company owns 100 percent of Global Win and 100 percent of Sutriv. Global Win owns 60 percent and Hyde Pacific Holding Company Ltd. (Hyde Pacific) owns 40 percent of Global Win Wickliffe LLC (GW Wickliffe), and GW Wickliffe owns 100 percent of Phoenix Paper.



Shanying also submitted as exhibits Shanying's discovery responses to special interrogatories and requests for admissions.

F.   ***Yang's Opposition to the Motion to Quash***

On November 5, 2021, Yang filed his opposition to the motion to quash.  He argued California has general jurisdiction over Shanying under the representative services doctrine and traditional agency principles; he also argued specific jurisdiction over Shanying.  He argued that evidence demonstrates Shanying was "a highly controlling 'helicopter parent' " of Global Win, controlled Global Win's day-to-day operations, finances, and had substantial, continuous, and systematic contacts with California. Yang further argued Global Win's "sole purpose" is to act "as a straw man" to assist the parent Shanying to advance its business of expanding its paper production in the United States.  To that end, Global Win "obtained $9.6 million from its parent, [GW Company] (which is [a subsidiary] fully owned by Shanying) . . . to contribute to the acquisition of the paper mill [Phoenix Paper]."

In support of his opposition, Yang submitted his declaration and the declaration of Ellis X. Liu—the Director of Human Resources at Global Win.

Yang's declaration provides:

On August 9, 2017, he received an offer of employment from Jingsi Cao of Shanying's Human Resources Department. The letter provides: "[W]e are very honored to engage you as a member of Shanying Paper's Family. [¶] You will be holding the position of Chief Financial Officer of North America Division." (Underscore omitted.)  He attached as an exhibit a copy of the offer letter.

On September 10, 2017, Yang entered into the employment agreement with Global Win.  Yang believed "Shanying's further direct control and involvement over [his] hiring at [Global Win]" was evidenced by Jiang's (the Vice President of Human Resources at Shanying) signature on the employment agreement.

Shanying had "direct control" over Global Win and "owns internal documents and communications by company management."  Shanying's executives "consistently refer to [Global Win] as [Shanying]'s 'North America Division' and not a separate entity."  Yang included as an exhibit a copy of an email he received from Jiang, with the "General Rules of Human Resource Management" (HR Rules) attached; the email stated these "rules [are] applicable to all employees of NA Division."  Yang also attached as an exhibit a copy of "Shanying International–North American Business Division ([Global Win]) Management [R]ules" (Management Rules) dated April 16, 2019 which provide: "The North American Business Division ([Global Win]), as one of [Shanying] headquarters' functional departments, is responsible for the Shanying group's investment M&A, industrial management and system building functions in USA."  The Management Rules specify Global Win is "a subsidiary of Shanying International."

Yang was one of five employees of Global Win, all of whom were "fully engaged in expanding Shanying's ownership of USA 'targets' (researching and acquiring U.S. based paper mills)."  Global Win "merely performed a function that was compatible with [assisting] parent-[Shanying] in the pursuit of parent's own business."  Shanying "control[led] and monitored" Global Win's acquisition on September 6, 2018 of Kentucky paper mill Phoenix Paper, "for the sole benefit of [Shanying]."  Global Win "was

9

merely acting as a straw buyer to meet the sole business needs of [Shanying]."  Global Win used "capital it obtained from Shanying's fully owned subsidiary [Cycle Link USA] to contribute to the acquisition" of Phoenix Paper.

Global Win "had no authority in selecting its own management team, staffing, or cost control.  Shanying tightly regulated its approval of the staffing and labor cost budgets of its subsidiaries."

Ellis X. Liu's (Liu) declaration provides:

Liu signed an employment agreement for the position of Human Resources Director on September 10, 2017.  The employment agreement was signed by Jiang "on behalf of [Global Win] and [Shanying]."  Liu included as an exhibit a copy of the agreement, which provides it is between Liu and "Global Win . . . , a Delaware corporation and a subsidiary of Shanying."  Just like Yang's employment agreement, the last page of Liu's agreement includes two signatures.  Underneath "Ellis X[.] Liu" is Liu's signature, and underneath "Global Win Capital Corporation" is Jiang's signature.  (Some capitalization omitted.)  Jiang's position is specified as "VP Human Resources"; the line beneath Jiang's position states "Shanying International Holdings Corporation Limited."  In addition to his Human Resources duties, Liu was "charged with identifying potential acquisition targets in the paper manufacturing industry for [Shanying]."  Shanying "exercised highly pervasive degree of control of [Global Win] and Cycle Link USA, from finances to highly regulated employee management."

Yang included additional exhibits in support of his opposition to the motion to quash, including Global Win's discovery responses and subpoenaed bank records, Shanying's

discovery responses, Jiang's discovery responses, and excerpts from Jiang's October 25, 2021 deposition. One such exhibit is Shanying's 2019 Interim Report. The business overview section of the interim report provides: "Shanying is an international enterprise integrating recycled fiber utilization, industrial and special paper production, packaging and printing, energy and environmental protection, industrial interconnection platform and other businesses." It further provides that at the end of its 2019 reporting period, Shanying "had 9 paper-making enterprises in China and abroad [and] 23 enterprises who provide service of packaging and printing design."

According to Jiang's October 25, 2021 deposition, Jiang studied English for "more than two years, almost three years." He has been in the United States since 2019. He communicates in "[p]redominantly Chinese" and does "not understand the majority of [English]." When he reads in English, he "ha[s] to use a translation software" such as "Google Translate, or . . . a dictionary called Youdao." During the deposition, Jiang was shown a copy of his declaration which was submitted in support of Shanying's motion to quash. When asked to discuss the content of the declaration, he stated his "English is not great. If you want me to read [an] English document, I need to rely on a translation software." He confirmed his attorney had provided him with the certified translation of this English document before he signed it and he had also used translation software to review his declaration. Jiang was next shown a copy of the employment contract he and Yang had signed. Jiang said it was "a [Global Win] contract" that Liu gave him to sign. Liu kept the copy of the employment agreement, not Jiang.

11

The memorandum of points and authorities filed in support of Yang's opposition to the motion to quash included one paragraph under the heading: "This Court Should Ignore the Declaration of Jintang Pan . . . and Kevin Jiang." (Boldface omitted.) Yang argued the declarations are "invalid" and should be "give[n] zero value." Yang further argued Jiang's declaration was submitted "in English" and "without a certified translation."

G. ***Shanying's Reply in Support of its Motion to Quash***

On November 12, 2021, Shanying filed its reply. Referring to and relying on its discovery responses, the reply provides: The employment offer letter was "issued by Shanying because Global Win had not yet been formed, and states the offer was for the position of CFO of a new U.S. company." Jiang signed the employment agreement on behalf of Global Win pursuant to a Special Power of Attorney. While Yang asserts that Shanying used Global Win as a strawman to acquire Phoenix Paper, "this statement is unsupported, and contradicted by the active role Yang himself played in the acquisition—including signing the acquisition agreement on behalf of Global Win—and in overseeing the operations of the paper mill after the acquisition."

Shanying argued the court should not strike the declarations of Pan and Jiang because 1) Yang himself relied on their declarations throughout his opposition; 2) Yang does not provide any explanation as to why Pan's declaration is "invalid"; and 3) Jiang had the declaration translated by his attorney Jia Li, a native Mandarin speaker, before signing it.

Shanying submitted declarations of Jiang and Jia Li in support of its reply.

Jiang's declaration provides:

Jiang's attorney reviewed Jiang's declaration with Jiang on a videocall before it was filed on September 24, 2021. During the videocall, Jiang's attorney "translated the contents" of the declaration from English to Mandarin Chinese. Jiang "fully understood the contents and purpose" of his declaration before it was filed.

Jiang stated the "intercompany loans between Global Win and its direct parent, [GW Company], and between Global Win and Cycle Link USA, [and] were properly documented." He attached as exhibits employment offer letters to individuals for positions at newly acquired Phoenix Paper, which state the new hiree "will report directly to Jeffrey Yang, CFO" of Global Win.

Jia Li's declaration provides:

Jia Li is Shanying's and Jiang's attorney. She is a "native Mandarin Chinese speaker and can read, write, and speak the language at a native/bilingual proficiency level" who can "translate between English and Mandarin Chinese." She reviewed and translated the contents of Jiang's declaration with him on a videocall before it was filed.

Shanying submitted an excerpt from Jiang's deposition transcript which was not provided by Yang. Jiang was asked about the HR Rules emailed to Yang. When asked if Global Win was "expect[ed] . . . to follow these . . . general rules of human resource management," he stated he "expected Global Win to reference [Shanying's] human resources rules and provision and draft its own human resources rules and provisions in conjunction with the local policy and rules." When asked about the Management Rules, he believed they were sent to Global Win from an "internal management perspective. Because Shanying is a publicly traded company, it often gets . . . audited from a third

13

party. So previously [Yang] was the one who approved his own invoices and paid, so it was not separated. They just wanted to be able to control it internally in order to avoid risks for a publicly traded company."

H. ***The Trial Court's Ruling***[1]

On December 2, 2021, the trial court held a hearing and granted the motion to quash. The court overruled Yang's objection to Jiang's declaration because it "wasn't framed as a separately filed objection."

Yang timely appealed.

## DISCUSSION

A. ***The Trial Court Did Not Abuse Its Discretion When It Overruled Yang's Challenge to the Pan and Jiang Declarations.***

We apply the abuse of discretion standard when reviewing a trial court's rulings on evidentiary objections. (*Geragos v. Abelyan* (2023) 88 Cal.App.5th 1005, 1021.)

Yang argues the trial court "should have stricken the declarations" of Pan and Jiang. He provides no argument or support in his opening brief as to why Pan's declaration should be stricken, as the entirety of his argument is about Jiang's declaration. Although Yang identified his challenge to Pan's declaration in an "argument heading" (*Roe v. McDonald's Corp.* (2005) 129 Cal.App.4th 1107, 1114), "[t]he absence of cogent legal argument or citation to authority allows this court to treat the contentions as waived." (*In re Marriage of Falcone & Fyke* (2008)

---

[1] Yang filed an objection to evidence the day of the hearing, on December 2, 2021. Shanying filed an objection to Yang's late-filed objections to evidence.

164 Cal.App.4th 814, 830; see also Cal. Rules of Court, rule 8.204(a)(1)(B) ["support each point [in a brief] by argument and, if possible, by citation of authority"].) An issue that is merely raised by the party without any argument or authority is deemed to be " 'without foundation and requires no discussion.' " (*Roe v. McDonald's Corp.*, at p. 1114; see *Golden Day Schools, Inc. v. Department of Education* (1999) 69 Cal.App.4th 681, 695, fn. 9.) We treat this argument as waived.

As to Jiang's declaration, Yang contends Shanying's submission of Jiang's declaration "in English *without certified translations*" renders it inadmissible. Yang argues "there is no evidence showing that [Jiang] actually read his declaration or understood its implications."

Yang's argument is not well taken. First, evidentiary objections are properly set forth in a separate document. (*Schoendorf v. U.D. Registry, Inc.* (2002) 97 Cal.App.4th 227, 240, fn. 2.) Here, Yang's objection to Jiang's declaration was not framed as a separately filed objection and is included as part of one paragraph at the end of the memorandum of points and authorities he submitted in support of his opposition to the motion to quash.

Second, Yang filed evidentiary objections on the day of the hearing—December 2, 2021, after which Shanying filed an objection to its late filing. We agree with Shanying that Yang's evidentiary objection was untimely. Code of Civil Procedure section 1005, subdivisions (a)(4) and (b) set forth filing deadlines on a motion to quash service of summons. Section 1005, subdivision (b) states all opposing papers shall be filed at least nine court days before the hearing. Yang's failure to file his objection to Jiang's declaration until the date of the hearing

15

renders it untimely. Moreover, Yang makes no showing of good cause as to why he waited so late to file his evidentiary objection.

Third, contrary to Yang's argument that there was "no evidence showing that [Jiang] actually read his declaration or understood its implications," Jiang stated during his October 25, 2021 deposition that he used a translation software to review his declaration and his attorney provided him with a certified translation of his declaration before he signed it. Jiang's declaration provided in support of Shanying's reply states his counsel "translated the contents of the Jiang [d]eclaration . . . from English to Mandarin Chinese" during a September 24, 2021 videocall and that he "fully understood the contents and purpose" of his declaration prior to its filing. Additionally, Jiang's attorney Jia Li personally verified in her declaration that she is a native Mandarin Chinese speaker and faithfully and accurately translated her client's written declaration via videocall prior to its filing. The foregoing constitutes evidence showing Jiang understood the content of his declaration prior to signing and filing it.

On this record, the trial court did not abuse its discretion in overruling Yang's objection.

## B. *Shanying's Motion to Quash Was Properly Granted*

### 1. General Legal Principles and Standard of Review

California courts "may exercise jurisdiction on any basis not inconsistent with the Constitution of this state or of the United States." (Code Civ. Proc., § 410.10.) The exercise of jurisdiction over a nonresident defendant "comports with the requirements of the due process clause of the federal Constitution

16

if the defendant has such minimum contacts with the state that the assertion of jurisdiction does not violate ' "traditional notions of fair play and substantial justice." ' " (*Vons Companies, Inc. v. Seabest Foods, Inc.* (1996) 14 Cal.4th 434, 444 (*Vons*), quoting *Internat. Shoe Co. v. Washington* (1945) 326 U.S. 310, 316.)

Where a nonresident defendant challenges jurisdiction by way of a motion to quash, plaintiff bears the burden of establishing by a preponderance of the evidence that minimum contacts exist between the defendant and forum state to justify imposition of personal jurisdiction.  Plaintiff must present facts demonstrating the conduct of defendants related to the pleaded causes of action is such as to constitute constitutionally cognizable minimum contacts.  (*Elkman v. National States Ins. Co.* (2009) 173 Cal.App.4th 1305, 1312–1313 (*Elkman*).)

We review the trial court's order granting a motion to quash service for lack of personal jurisdiction "de novo, considering all the evidence set forth in the moving and opposition papers except that to which objections were made and sustained." (*Johnson v. City of Loma Linda* (2000) 24 Cal.4th 61, 65–66.)  Evidence in support of jurisdictional facts or their absence may be in the form of declarations.  (*Evangelize China Fellowship, Inc. v. Evangelize China Fellowship* (1983) 146 Cal.App.3d 440, 444.)  "[W]here the evidence of jurisdictional facts is *not* conflicting, the question of whether a defendant is subject to personal jurisdiction is one of law." (*Elkman, supra,* 173 Cal.App.4th at p. 1313.)  However, where there is a conflict in the evidence and/or declarations, resolution of the conflict by the trial court will not be disturbed on appeal if the determination is supported by substantial evidence.  (*Evangelize*

17

*China Fellowship*, at p. 444; *Edmunds v. Superior Court* (1994) 24 Cal.App.4th 221, 228, 232.)

Personal jurisdiction may be general or specific. (*Vons*, *supra*, 14 Cal.4th at p. 445.) General jurisdiction is sometimes called "all-purpose" and specific jurisdiction is sometimes called "case-linked." (*Bristol-Myers Squibb Co. v. Superior Court of Cal., San Francisco Cty.* (2017) 582 U.S. 255, 262 (*Bristol-Myers*).) The standard for general jurisdiction is considerably more stringent than that for specific jurisdiction. (*Paneno v. Centres for Academic Programmes Abroad Ltd.* (2004) 118 Cal.App.4th 1447, 1455.) In this case, Yang contends both general and specific jurisdiction exist; we consider each separately.

2. **The Trial Court Correctly Determined It Cannot Exercise General Jurisdiction Over Shanying.**

Yang argues sufficient contacts exist between Shanying and California to establish general jurisdiction under agency principles and the representative services doctrine.

a. <u>General Jurisdiction</u>

A defendant is subject to general jurisdiction when it has substantial, continuous, and systematic contacts in the forum state, i.e., its contacts with the forum are so wide-ranging that they take the place of a physical presence in the state. (*Vons*, *supra*, 14 Cal.4th at pp. 445–446; *Daimler AG v. Bauman* (2014) 571 U.S. 117, 127 [a nonresident corporation's contacts with the state must be so continuous and systematic that it can be considered "at home" there].) In assessing a defendant's contacts with the forum, we look at the contacts as they existed from the

18

time the alleged conduct occurred to the time of service of summons.  (*DVI, Inc. v. Superior Court* (2002) 104 Cal.App.4th 1080, 1100–1101 (*DVI*).)  For a corporation, its domicile, place of incorporation, and/or principal place of business within a state constitute the paradigm bases for establishing general jurisdiction.  (*Goodyear Dunlop Tires Operations, S.A. v. Brown* (2011) 564 U.S. 915, 924.)  A defendant corporation's substantial sales in a state are insufficient to establish general jurisdiction, as the general jurisdiction analysis turns on the nature of the defendant's *continuous* corporate operations within a state.  (*Daimler*, at pp. 138–139.)

Here, the evidence shows Shanying is a Chinese corporation.  Shanying trades on the Shanghai Stock Exchange, but not any stock exchange in the United States.  Its undisputed principal place of business, offices, and mailing address are in China.  Shanying has never been incorporated in or had its principal place of business in California or the United States.  It has never been licensed to conduct business in California or the United States.  Shanying provided a Certificate of No Record Corporation from the California Secretary of State in support.  Pan's declaration also attested to the foregoing.  These facts are not sufficient to support general jurisdiction.

        b.    <u>Agency</u>

Under agency principles, the analysis for general jurisdiction bypasses the foreign corporation's direct minimum contacts and the contacts are instead imputed through the presence of the local agent through whom the foreign corporation acts.  (*F. Hoffman–La Roche, Ltd. v. Superior Court* (2005) 130 Cal.App.4th 782, 796 (*Hoffman–La Roche*).)

In the case of agency, the corporate identity is preserved, but the principal is held for the acts of the agent. (*Hoffman–La Roche*, *supra*, 130 Cal.App.4th at p. 797.) Agency is established where the entity for whom the work is performed has the right to control the activities of the alleged agent. Agency in the context of general jurisdictional analysis requires more than mere ownership or control. Normally, control is shown where there is a close financial connection between the parent and its subsidiary, and there is a degree of direction and management exercised by the parent over the subsidiary. However, "[i]t must veer into management by the exercise of control over the internal affairs of the subsidiary and the determination of how the company will be operated on a day-to-day basis." (*Ibid*.) The degree of control exercised by the parent over the subsidiary must reflect the parent's purposeful disregard of the subsidiary's independent corporate existence. (*Sonora Diamond Corp. v. Superior Court* (2000) 83 Cal.App.4th 523, 542 (*Sonora*).) Further, in the absence of fraud or injustice, courts will treat the parent and subsidiary as separate entities for purposes of jurisdictional analysis. (*Hoffman–La Roche,* at p. 797.)

Under agency, we find Yang failed to present evidence of Shanying's day-to-day control of Global Win. Yang provided evidence that he received an email from Jiang with Shanying's HR Rules "applicable to all employees of NA Division" as well as the Management Rules. Yang maintains Shanying set human resource policies for Global Win and designed its organizational structure. Yang provided evidence that he was hired via an employment agreement signed by Jiang, who was then the Vice President of HR for Shanying. He also provided evidence that he had to submit for approval some financial expenses to Shanying.

20

These facts do not rise to the level of a parent company's purposeful disregard of the subsidiary's independent corporate existence. (*Sonora*, *supra*, 83 Cal.App.4th at p. 542 ["The nature of the control exercised by the parent over the subsidiary necessary to put the subsidiary in an agency relationship with the parent must be over and above that to be expected as an incident of the parent's ownership of the subsidiary and must reflect the parent's purposeful disregard of the subsidiary's independent corporate existence."]; see *Rollins Burdick Hunter of So. Cal., Inc. v. Alexander & Alexander Services, Inc.* (1988) 206 Cal.App.3d 1, 9 (*Rollins*).)

Neither ownership nor control of a subsidiary corporation by a foreign parent corporation, without more, subjects the parent to the jurisdiction of the state where the subsidiary does business. (*Cannon Mfg. Co. v. Cudahy Co.* (1925) 267 U.S. 333, 336–337.) "Control" in this context means "the degree of direction and oversight normal and expected from the status of ownership; it comprehends such common characteristics as interlocking directors and officers, consolidated reporting, and shared professional services." (*Sonora*, *supra*, 83 Cal.App.4th at pp. 540–541.) "As a practical matter, the parent must be shown to have moved beyond the establishment of general policy and direction for the subsidiary and in effect taken over performance of the subsidiary's *day-to-day* operations in carrying out that policy." (*Id.* at p. 542.) The evidence presented by Yang does not demonstrate Shanying's control of day-to-day operations; rather, it shows "normal involvement by a parent corporation with its subsidiary." (*Id.* at p. 551.)

The relationship of owner to owned contemplates a close financial connection between parent and subsidiary and a certain

degree of direction and management exercised by the former over the latter. (*Id.* at p. 541; see *Rollins, supra,* 206 Cal.App.3d at p. 9.) When Jiang was asked at deposition about the HR Rules sent to Yang and whether Global Win was "expect[ed] . . . to follow these Shanying . . . general rules of human resource management," he stated that he "expected Global Win to reference [Shanying's] human resources rules and provision and draft its own human resources rules and provisions in conjunction with the local policy and rules." Moreover, when asked about the Management Rules being sent to Global Win, Jiang believed it was from an "internal management perspective. Because Shanying is a publicly traded company, it often gets . . . audited from a third party. So previously [Yang] was the one who approved his own invoices and paid, so it was not separated. They just wanted to be able to control it internally in order to avoid risks for a publicly traded company." This is a satisfactory explanation. In addition, the fact that Global Win maintained its own corporate identity is further solidified via Global Win's employment offer letters to individuals for positions at the newly acquired Phoenix Paper, which expressly provide the new hiree "will report directly to Jeffrey Yang, CFO" of Global Win.

These events can hardly be viewed as so pervasive or systematic as to justify assertion of jurisdiction over Shanying for all purposes under an agency theory. They appear to be the kind of transactions routinely entered into between foreign corporations and their domestic affiliates.

c.      Representative Services Doctrine

Finally, the representative services doctrine confers general jurisdiction where the "local subsidiary performs a function that is compatible with, and assists the parent in the pursuit of, the

22

parent's *own* business, but the doctrine does not support jurisdiction where the parent is merely a holding company whose only business pursuit is the investment in the subsidiary." Where the parent uses the subsidiary to do what it otherwise could do itself, it has purposefully availed itself of the forum state, and jurisdiction is proper. (*Sonora, supra,* 83 Cal.App.4th at p. 543.)

Yang argues Shanying "is not a passive holding company because its primary business is manufacturing and distributing paper products." Yang cites to the business overview section of Shanying's 2019 interim report, including an excerpt that defined Shanying as "an international enterprise integrating recycled fiber utilization, industrial and special paper production, packaging and printing, energy and environmental protection, industrial interconnection platform and other businesses."

The burden is on Yang to prove Shanying is not a holding company. A holding company is a company formed to control other companies, usually confining its role to owning stock and supervising management; it does not participate in making day-to-day business decisions in those companies. (*BBA Aviation PLC v. Superior Court* (2010) 190 Cal.App.4th 421, 431 (*BBA*).) A true holding company does not engage in operational control of the businesses that it owns. (*Ibid.*) A holding company performs no function outside of investing in its subsidiaries and, thus, imputing jurisdictional contacts would be improper. (*Id.* at p. 430.) For purposes of appellate review, we consider whether there is substantial evidence to support the court's finding to that effect. (*Dorel Industries, Inc. v. Superior Court* (2005) 134 Cal.App.4th 1267, 1273 (*Dorel*).)

23

Pan's declaration in support of Shanying's motion to quash states Shanying "operates . . . as a passive holding company—i.e., it held the ownership interest in other entities, but it did not operate any business."  (See *BBA*, *supra*, 190 Cal.App.4th at p. 432 ["Given [wrongful termination plaintiff's] limited evidence, greater weight should be placed on the sworn declarations of [foreign parent corporation's officers] explicitly stat[ing] that [the foreign parent corporation] is a holding company."].)  The evidence shows Shanying invested in its subsidiaries which, in turn, invested in Global Win.  Yang has not presented any evidence that demonstrates Shanying conducted business activity other than investing in subsidiaries and in maintaining some oversight in the acquisition of Phoenix Paper in the context of its role as investor.

We have already found Shanying does not engage in operational control of Global Win.  The excerpt from Shanying's 2019 interim report that it is "an international enterprise" that integrates businesses involved in various recycled fiber and paper production, is not evidence that Shanying would have undertaken the same business activities if it had not had a representative (i.e., Global Win) to perform them for it.  (*Dorel*, *supra*, 134 Cal.App.4th at p. 1277.)  It only confirms that Shanying invests in companies in multiple countries involved in the paper production business, including its investment in Global Win, which enabled Global Win to purchase Phoenix Paper.  (See *BBA*, *supra*, 190 Cal.App.4th at p. 430 [the representative doctrine does not support jurisdiction where the parent is merely a holding company whose only business pursuit is the investment in the subsidiary]; see also *Hoffman–La Roche*, *supra*, 130 Cal.App.4th at p. 802 ["there was no evidence that this entity

24

is, or conducts itself as, anything other than a true passive holding company that globally invests in pharmaceutical subsidiaries, including the two [defendants] here, with no exercise of operational control whatsoever over these subsidiaries"].) Yang has provided no evidence to demonstrate that "but for the local agent's [(i.e., Global Win's)] existence, the parent would be performing those functions in the forum itself." (*BBA*, at p. 430)

Here, substantial evidence supports the trial court's finding that Shanying is a holding company. The representative services doctrine does not support exercising general jurisdiction over Shanying.

### 3. **The Trial Court Correctly Determined It Cannot Exercise Specific Jurisdiction over Shanying.**

When determining whether specific jurisdiction exists, courts consider the "relationship among the defendant, the forum, and the litigation." (*Shaffer v. Heitner* (1977) 433 U.S. 186, 204.) A court may exercise specific jurisdiction over a nonresident defendant if a three-prong test is met: (1) "the defendant has purposefully availed himself or herself of forum benefits" (*Vons*, *supra*, 14 Cal.4th at p. 446); (2) "the 'controversy is related to or "arises out of" [the] defendant's contacts with the forum'" (*ibid.*, quoting *Helicopteros Nacionales de Colombia v. Hall* (1984) 466 U.S. 408, 414); and (3) "the assertion of personal jurisdiction would comport with 'fair play and substantial justice.'" (*Burger King Corp. v. Rudzewicz* (1985) 471 U.S. 462, 476.)

To exercise specific jurisdiction over a claim, "there must be an 'affiliation between the forum and the underlying controversy,

principally, [an] activity or an occurrence that takes place in the forum State.' [Citation.] When there is no such connection, specific jurisdiction is lacking regardless of the extent of a defendant's unconnected activities in the State." (*Bristol-Myers*, *supra*, 582 U.S. at p. 264.) In other words, specific jurisdiction depends on "the quality and nature of the defendant's forum contacts in relation to the particular cause of action alleged." (*Anglo Irish Bank Corp., PLC v. Superior Court* (2008) 165 Cal.App.4th 969, 978.)

Applying these standards to the facts of this case, we conclude California may not exercise specific jurisdiction over Shanying.

### a. Did Shanying purposefully avail itself of forum benefits?

We begin with the purposeful availment prong of the test. " 'The purposeful availment inquiry . . . focuses on defendant's intentionality. [Citation.] This prong is only satisfied when the defendant purposefully and voluntarily directs [its] activities toward the forum so that [it] should expect, by virtue of the benefit [it] receives, to be subject to the court's jurisdiction based on' [its] contacts with the forum." (*Pavlovich v. Superior Court* (2002) 29 Cal.4th 262, 269.) "[T]he underlying rationale of all the purposeful availment tests is that 'it is fair to subject defendants to specific jurisdiction, because their forum activities should put them on notice that they will be subject to litigation in the forum.' " (*Gilmore Bank v. AsiaTrust New Zealand Ltd.* (2014) 223 Cal.App.4th 1558, 1573 (*Gilmore Bank*).)

Here Yang argues Shanying purposefully availed itself of the California forum and its benefits by forming Global Win in California. This contention is contrary to law. "Mere ownership

of a subsidiary in the forum state does not constitute purposeful availment." (*BBA*, *supra*, 190 Cal.App.4th at p. 436; *HealthMarkets, Inc. v. Superior Court* (2009) 171 Cal.App.4th 1160, 1168.)

Yang next argues Shanying purposefully availed itself of the California forum by deliberately directing Global Win's day-to-day operations in California. We have already concluded and found in the preceding section that Yang failed to present evidence of Shanying's day-to-day control of Global Win. Yang refers to Shanying's HR Rules and Management Rules which were sent to Global Win, but transmission of those rules does not rise to the level of a parent company's deliberate control of a subsidiary. (See *Sonora*, *supra*, 83 Cal.App.4th at p. 542, first italics added ["the parent must be shown to have moved beyond the *establishment of general policy and direction for the subsidiary* and in effect taken over performance of the subsidiary's *day-to-day* operations in carrying out that policy"].)

Yang also argues Shanying purposefully availed itself of the California forum by "overseeing Global Win's budgeting," but the law does not support Yang on that front either. Shanying's general overseeing of one of its subsidiaries' finances shows "normal involvement by a parent corporation with its subsidiary." (*Sonora*, *supra*, 83 Cal.App.4th at p. 551.) The relationship of owner to owned contemplates a close financial connection between parent and subsidiary and a certain degree of direction and management exercised by the former over the latter. (*Id.* at p. 541; see *Rollins*, *supra*, 206 Cal.App.3d at p. 9.) Yang has not shown or referred us to evidence that demonstrates otherwise.

The record provides that Shanying had no connection with California other than its ownership, twice removed, of Global

27

Win.  The record does not support the conclusion that Shanying has "purposefully availed" itself of the California forum.

> b.  Does the controversy relate to or arise out of Shanying's contacts with the forum?

The second prong of the test for specific jurisdiction is whether the current controversy is "related to or arise[s] out of the defendant's contacts with the state." (*Gilmore Bank*, *supra*, 223 Cal.App.4th at p. 1568, italics omitted.)  In *Vons*, our Supreme Court explained that this second prong is satisfied if "there is a *substantial nexus or connection* between the defendant's forum activities and the plaintiff's claim." (*Vons*, *supra*, 14 Cal.4th at p. 456, italics added.)  "A claim need not arise directly from the defendant's forum contacts in order to be sufficiently related to the contact to warrant the exercise of specific jurisdiction.  Rather, as long as the claim bears a substantial connection to the nonresident's forum contacts, the exercise of specific jurisdiction is appropriate." (*Id*. at p. 452.)

We find that the underlying controversy, namely, Yang's wrongful termination claims, do not arise from any forum contacts by Shanying.  Yang's employment claims arise out of his termination as the CFO of Global Win and the alleged breach of his employment agreement with Global Win.  The employment agreement provides it was "made and entered . . . by and between [Global Win]" and Yang.  Yang was terminated not by Shanying, but by Global Win.  Yang's complaint and declaration provide that after he "discovered and reported multiple serious fraudulent activities," he "raised his concerns to the upper management," leading to termination of his employment.  Yang's reporting of his concerns to Global Win's management/CEO, would mean any retaliation would have similarly been from

28

Global Win, not Shanying.  Further, there is no evidence showing that Global Win was required to or did obtain approval from Shanying before firing personnel.

Given Yang's failure to satisfy the first two prongs, we need not address the third prong.  (See *Integral Development Corp. v. Weissenbach* (2002) 99 Cal.App.4th 576, 591 [only after "a plaintiff has shown the requisite minimum contacts to support jurisdiction, the burden shifts to defendant to show jurisdiction is not reasonable."].)

c.     Alter Ego Theory

Yang's final contention is that a California court has specific jurisdiction over Shanying under the "alter ego" theory. To that end, he argues the evidence demonstrates that Global Win "was not adequately capitalized" and incorporates arguments already made for the exercise of general jurisdiction under the alter ego theory.

Alter ego is a method by which the corporate form will be disregarded where (1) there is such a unity of interest and ownership between the corporation and its equitable owner such that the separate personalities of the corporation and the equitable owner in reality do not exist; and (2) there is an equitable result in treating the acts of the corporation as those of the corporation alone.  (*Sonora, supra*, 83 Cal.App.4th at p. 538.) Factors to consider in applying the doctrine include commingling of funds and other assets of the two entities; ostensible liability of one entity for the debt of another; identical ownership of the two entities; use of the same offices and employees; inadequate capitalization; disregard of corporate formalities; and identical directors and officers.  (*Id*. at pp. 538–539.)

29

We are directed to no evidence that Global Win was in fact a sham, shell, or alter ego for Shanying. The most we can extract from this record in support of such a contention is that Jiang was the Vice President and previously the Vice President of Human Resources at Shanying, as well as Global Win's Vice President from November 2018 to August 2020, CEO from August 2020 to January 2021, and Director and President since October 2019. That Jiang was an officer or director of Global Win and the Vice President of Human Resources at Shanying does not establish the requisite jurisdictional contacts. (*Sonora*, *supra*, 83 Cal.App.4th at pp. 548–549 ["that the directors and officers were interlocking is insufficient to rebut the presumption that each common officer or director wore the appropriate 'hat' when making corporate and operational decisions for the respective entities"]; see *Ziller Electronics Lab GmbH v. Superior Court* (1988) 206 Cal.App.3d 1222, 1233 [despite similarity in corporate names and *existence of common directors*, it was a matter of "pure speculation to conclude that the companies are identical, alter egos, or have such a control relationship as to subject [foreign corporate] defendant to personal jurisdiction here"]; *United States v. Bestfoods* (1998) 524 U.S. 51, 69 [parent is not exposed to liability for acts of subsidiary merely because directors of one are also directors of other].) Thus, the mere existence of a common director, here Jiang, is insufficient to establish alter ego, as overlapping corporate officers and directors are normal attributes of a parent-subsidiary relationship. (*DVI*, *supra*, 104 Cal.App.4th at pp. 1095–1097.)

As to Yang's contentions about Global Win's inadequate capitalization and receipt of investments from Shanying, Yang's own declaration in support of his opposition to the motion to

30

quash admits *Shanying* did not acquire Phoenix Paper, the paper mill company in Kentucky. Yang also admits Global Win did not directly receive funds from Shanying. Yang declares Global Win used "capital it obtained from Shanying's fully owned subsidiary [Cycle Link USA] to contribute to the acquisition" of Phoenix Paper. He also notes that Global Win obtained $9.6 million from its direct parent GW Company, another subsidiary owned by Shanying, to contribute to the acquisition of Phoenix Paper. To view Global Win's acquisition of a paper mill in Kentucky as a jurisdictional contact between Shanying and California is farfetched. Yang also asks us to, in effect, disregard the intermediate loans by Cycle Link USA and Global Win's parent GW Company to Global Win, which—per 's Jiang's declaration in support of the reply—were "properly documented, dealt with as legitimate financial obligations, and fully repaid (principal and interest) by Global Win."

This is not a situation where the alter ego doctrine should be invoked and a corporate entity disregarded because "an abuse of the corporate privilege justifies holding the equitable ownership of a corporation liable for the actions of the corporation." (*Sonora, supra*, 83 Cal.App.4th at p. 538.) "The parent is not 'exposed to liability for the obligations of [the subsidiary] when [the parent] contributes funds to [the subsidiary] for the purpose of assisting [the subsidiary] in meeting its financial obligations and not for the purpose of perpetrating a fraud.'" (*Id.* at p. 539.)

31

## DISPOSITION

The trial court's order granting Shanying's motion to quash is affirmed.  Appellant Yang to bear costs on appeal.  (Cal. Rules of Court, rule 8.278(a)(1).)

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

STRATTON, P. J.

We concur:

GRIMES, J.

WILEY, J.